To make a survey and condemnation for unsoundness &c., a bar within the usual memorandum, it must appear that the vessel was condemned for unsoundness or rottenness *only.* If the survey states injuries by storm as well as by decay, and concludes that the surveyors are therefore of opinion that the vessel is unworthy of repair and unfit for sea, and the decree of the admiralty is founded upon the report generally, such a survey and condemnation are not a bar.

ARMROYD *against* The Union Insurance Company.

THIS was an action on a policy of insurance dated the 28th of *September* 1803, upon the brig *Fair American,* valued at 5000 dollars, at and from *Philadelphia* to *Barbadoes* &c. The policy contained the following printed clause: " If the above vessel after a regular survey should be condemned for being unsound or rotten, the assurers shall " not be bound to pay their subscriptions on this policy."

The cause was tried before the Chief Justice at Nisi Prius in *February* last, in conjunction with a suit upon a policy on goods by the same vessel; and in each case the single question was seaworthiness.

The brig sailed from *Philadelphia* on the 3d of *September* 1803, and put back in consequence of a small leak. Her cargo was taken out, and she received repairs to a very considerable amount, the carpenter's bill alone being 254*l.* She sailed again on the 26th; and on the 1st, 6th, and 24th of *October,* she experienced violent gales, in the last of which she was laid on her beam ends, when the crew were obliged to cut away the mainmast and rigging, and to discharge the deck load, in order to save their lives. In consequence of this weather, the brig was so much strained as to leak excessively, having seldom less than five feet water in the hold; and it was with great difficulty that she made *St. John's* in the island of *Antigua,* on the 11th of *November.* On the day after her arrival, the captain petitioned the court of admiralty for a warrant of survey, which was granted on the same day, directed to two merchants, two ship masters, and two shipwrights in the usual form; and on the first of *December,* the surveyors returned the following report:

" In obedience to the foregoing warrant of survey, we " whose names are hereunto subscribed, being all of the per- " sons to whom the same is directed, did on *the twelfth day of* " *November* last repair on board the said brig *Fair American,* " whereof *Lambert Whillden* was master, then lying at anchor " in the harbour of *St. John* in this island *Antigua,* and " having had the brig pumped entirely dry, we waited fifteen

" minutes, at the expiration of which time we sounded, and " found that she had made six inches of water. That upon " diligently viewing searching and examining into her state " and condition, we found that her mainmast had been cut " away five or six feet from the deck; that a timber head, and " two quarter deck stancheons on the starboard side, had " been carried away; that the starboard pump was split by " the falling of the mast; that the boat on the stern was stove; " that the back part of the rudder was loose; that the main " hatch was well secured, and the barrels in the hatchway " were quite dry; and from the report of the said *Lambert* " *Whillden*, the deck load had been thrown overboard. That " from the quantity of water which she had, and did then " make, we were induced to believe the cargo had received " considerable damage; we therefore recommended that part " of the cargo should be discharged, in order that we might " take a further view of the vessel and cargo. That by *the* " *fourteenth day of the same month of November* past, part of " the cargo was accordingly discharged, and we again re- " paired on board the said brig *Fair American*, and upon " inspecting the cargo, we found a great many of the barrels " and half-barrels very much damaged by the sea-water. " We therefore directed the whole of the cargo to be landed, " so that it may be carefully examined, to enable us to as- " certain what further steps would be most eligible to be " taken for the benefit of the parties interested. That on *the* " *twenty-fourth of the same month* of November, we again " repaired on board the said brig *Fair American;* and having " ordered the ceiling to be taken off about the lower futtock- " head, where the middle and lower futtocks met, *from the* " *main chains aft we found the timbers quite decayed. That* " *the upper breasthook and wing transom was in the same* " *decayed state.* That the trunnels were started in many " places, and generally very loose and *rotten;* and that the " ceiling throughout was *decayed and loose.* We THEREFORE " were of opinion, that the said brig *Fair American* was *un-* " *worthy of repair*, and *unfit for sea*, and that it would be " most to the advantage of the parties concerned, that she " should be forthwith sold at public auction."

On the same day that the report was returned, the judge. of vice-admiralty, " upon reading the petition &c. the judge's

" warrant in pursuance thereof, and *the report or return of*
" *the surveyors*, &c., and also upon hearing the arguments
" of his majesty's advocate general, of counsel with the said
" *Lambert Whillden*, was pleased to order, adjudge, and
" decree, that the said brig *Fair American*, her tackle, ap-
" parel, and furniture, be sold by the marshal of this court,
" and that the proceeds thereof, after paying all costs and
" charges, be paid into the hands of the said *Lambert Whill-*
" *den*, &c.;" and she was accordingly broke up, and sold.

Much evidence was given upon the trial to shew that the
brig was seaworthy when she left *Philadelphia;* but however
that evidence might affect the policy on goods, it was con-
tended by the defendant's counsel, that the survey and con-
demnation were conclusive evidence of unseaworthiness,
and under the memorandum, a bar to the plaintiff's recovery
upon the policy on vessel.

Upon this point *Tilghman* C. J. charged the jury as fol-
lows.

I am called on to give my opinion on the construction of
the memorandum, and of the survey and condemnation in
this case. It is a contract which bears hard on the assured,
especially in long voyages; but being the agreement of the
parties, and not being contrary to law, no court has a right
to say that it is void. It is to receive a fair construction; but
not to be extended beyond the plain meaning of the words.
If there is a regular survey and condemnation for unsound-
ness or rottenness, the assurers are discharged. When I say
unsoundness, I mean, as the law was decided in the case of
*Garrigues* v. *Coxe*, an unsoundness arising from decay, and
not from accidental injury. But then the unsoundness or
rottenness must be the *sole* cause of condemnation. If the
condemnation is grounded partly on rottenness, and partly
on damage sustained by violence of storms &c., the case is
not within the contract. In the present instance, the survey
and condemnation are regular in point of form. There was
a petition to the judge by the captain, a warrant of survey,
a report of the surveyors, and a decree founded thereon. It
is not necessary that the judge should make use of the word
*condemn*, in cases of this kind. It is enough, if upon the whole
matter he orders a sale of the vessel. There is no occasion to

decide whether in all cases, there must be a *decree* of a judge. Surveys may sometimes be made in places where there is no court. But on this I give no opinion. In this case there was a decree. It is contended by the defendants' counsel, that the record shews a condemnation for rottenness. The opinion of the surveyors he supposes is founded on that cause only, and the decree of the judge is founded on the opinion of the surveyors. The report shews that the surveyors made two examinations. On the first they viewed the state of the vessel with the cargo on board, and they mention the loss of the mainmast, and other material injuries, sustained by the violence of winds and seas, and not by the decay of timber. The last examination was after the cargo was taken out, and the inside timbers exposed to view, by ripping off some of the planks of the vessel. Marks of considerable decay were observed, and are particularly mentioned. The report then concludes, " we *therefore* were of " opinion that the said brig was unworthy of repair, and " unfit for sea, and that it would be most to the advantage " of the parties concerned, that she should be forthwith sold " at public auction." But is this conclusion drawn from the the facts respecting *rottenness, immediately preceding* it? I am of opinion that it is *not*, but from the whole matter stated in the report. The loss of the mainmast &c. were facts extremely material in deciding whether it was for the benefit of the concerned to sell the vessel. They would have been injured by repairs, which might cost more than the vessel would be worth when repaired. It appears to me therefore, to be an unreasonable and forced construction, to confine the conclusion of the surveyors to the facts respecting the rottenness of particular timbers. But let us now consider the decree, which is a very material part of the record. The condemnation is by the *judge only*. It is said that after hearing the *report*, and the arguments of counsel, he ordered a sale. But what pretence is there for supposing, that the decree is founded upon one part of the report more than another, when the judge assigns no particular cause. If the loss of the mainmast &c. was an important consideration, why should we suppose that the judge paid no regard to it? I cannot bring myself to consider it in that light. Upon every principle of fair construction, it appears to me that the

1810.

ARMROYD
*v.*
UNION
INS. CO.

decree is founded on the *whole collection* of facts reported by the surveyors. I am therefore of opinion, that the plaintiff is not barred by the survey and condemnation given in evidence.

The Chief Justice then said, that the case resulted to the single point, whether upon the evidence, the vessel was seaworthy at the commencement of the voyage; and he expressed the inclination of his mind that she was. After the charge, the counsel for the defendants gave notice, that to have the question under the memorandum finally settled, he should move it in bank upon a motion for a new trial; and the jury found for the plaintiff in both actions.

A motion for a new trial was accordingly made; and it was now argued by *Dallas* for the defendants, and by *Gibson* and *Tilghman* for the plaintiff.

*For the defendants.* The clause was introduced at the instance and for the benefit of the underwriter, to get rid of the necessity of proving that the unsoundness or rottenness of the vessel, existed at the commencement of the risk. It should therefore be liberally construed for his protection. The contract is not a hard one in general, because in a voyage of medium length, the unsoundness established by the survey, must by necessary implication be referred to the outset of the voyage; it is certainly not hard in such a voyage as the present. It never was intended by the parties, that if, at the same time that the survey found unsoundness in the hull, it noticed the loss of masts &c. by storm, this should take the case out of the clause; for it would elude the clause in every case, where the vessel had lost a spar upon the voyage, as it is notoriously the practice in all surveys, to state minutely the superficial losses and defects. It is finding rottenness in the hull, that brings the clause into operation; and unless the other matters are expressly connected with the unsoundness, and specified as the cause of condemnation, the bar is complete. There has been no decision upon the memorandum that can govern this case. In *The Marine Insurance Company* v. *Wilson* (*a*), the report did not mention unsoundness or rottenness, and the defects referred to, were

(*a*) 3 *Cranch.* 187.

limited to a time subsequent to the commencement of the voyage. In *Garrigues* v. *Coxe* (a) the condemnation was founded exclusively upon the damage done by rats. In *Watson* v. *The Insurance Company of North America* (b), the reason assigned for condemnation was in part the want of materials and mechanics, and that the repairs would cost more than the vessel would be worth. Then how is the survey in the present case? The first visit produces a narrative of none but accidental losses. The surveyors draw no conclusion from it. Their attention was from the first directed to the leak, which was not produced by any thing then observed. To ascertain it they ordered a partial, and then a complete discharge of the cargo. On the third visit they come to the hull. The timbers, the upper breasthook, and wing transom are *decayed*, the trunnels are started and *rotten*, the ceiling is started and *decayed;* and then without connecting the loss of mast, &c. with these facts, they say we are *therefore* of opinion that the brig is *unworthy of repair*, and unfit for sea. *Therefore* relates to the next antecedent, the decay and rottenness; it lies upon the plaintiff to shew that the loss of the mast was a part of the consideration. *Unworthy of repair* implies that repairs could be gotten, but that the brig was too rotten to deserve them. There is nothing about want of materials or skill, or the cost of repairs. Decay is expressly assigned as the reason, and nothing else; and the court cannot go out of the report. When the judge ordered a sale, he adopted the conclusion of the surveyors.

*For the plaintiff.* The construction of the clause is not to be affected by its being introduced by the insurer; if it is at all doubtful, the turn of the scale should be in favour of the assured. *Cowp.* 148. 1 *Burr.* 349. But all that is required, is a fair construction. It is certainly a hard clause in long voyages, and is not beneficial to the assured in any case, because the survey does not conclude the underwriters. In this case the jury have found the vessel to have been seaworthy when she left *Philadelphia;* of course the defendants must rest exclusively upon the clause, and they must therefore bring themselves in every respect within it. The case of

(a) 1 *Binn.* 592.           (b) *Cir. C. U. S. Penn. dist.*

*Margin:* 1810. ARMROYD *v.* UNION INS. Co.

*Garrigues* v. *Coxe* settles the construction, that if the survey shew unsoundness from decay only, then the clause bars; but if the whole survey taken together shew injury by accident as well as by decay, it does not bar. A mixed reason for the condemnation, takes the case out of the clause. *Watson* v. *Insurance Company of North America.* The surveyors may recite sea damage to the upper works, and also find unsoundness in the hull. The mere recital of sea damage does not destroy the effect of the clause; because the surveyors may ground the condemnation upon unsoundness only. But unless they do, how is it possible for the court to say, which had the most effect upon the condemnation? Before the clause can bar, the surveyors must pin their conclusion to unsoundness alone. Here the opinion is founded upon all the surveyors had seen. " *Therefore*" comprehends the whole that goes before. But if it did not, the decree of the judge does. A condemnation is clearly necessary where there is a court, though it may be otherwise where there is none; and this condemnation, which is therefore essential, is not founded upon this or that remark of the surveyors, but upon the report, that is, the whole. It is impossible to say that the repair of the injuries done by storms, did not enter into the calculation of the surveyors. They would have made the most important items of expence; and the very terms used, shew that they may have been included. They find the brig unworthy of repair, not unseaworthy; and every vessel may be unworthy of repair, even when sound, from the great cost of repairs. It is sufficient for us, that it does not appear that the brig was condemned solely on account of unsoundness or rottenness.

YEATES J. after stating the report and decree, delivered his opinion as follows:

It has been contended by the defendants' counsel, that this survey, which I have detailed somewhat at large, forms a complete bar to the plaintiff's recovery; and unless it be so construed, it defeats the object of the company in inserting the clause in question;—that the conclusion of the surveyors, immediately after the word *therefore*, is necessarily founded on what they had seen in their last visit, the decay of timbers, breasthook, trunnels and ceiling; and that the finding of the

brig to be *unworthy of repair*, and *unfit for sea*, having reference to the last antecedent, substantially asserted, that she was *unsound* and *rotten*, within the true meaning of the policy. Another cause on a policy on goods on board the brig, wherein a clause of like import was not introduced, having been tried at the same time, with the present action, precluded the defendant's counsel from bringing the naked question before the court, by taking an exception to the evidence of sea worthiness, offered on the part of the plaintiff.

Unquestionably, courts of justice are bound to construe all contracts, according to the true intent and meaning of the parties, and to execute them accordingly. Where technical expressions are not used, the words are to be taken in their plain and obvious sense, and not to be strained on either side.

It has been said, on the part of the plaintiff, that in order to render the survey an estoppel to the plaintiff's recovery, it must clearly appear, that there was a condemnation by the judge, on the ground, that the vessel was *unsound* and *rotten;* while it was admitted, that the necessity thereof would be superseded in a country, where there was no legal tribunal to make such adjudication. The difficulty, as I take it, does not occur in the present instance. The judge on reading the captain's petition, his own warrant, and the return of the surveyors, and hearing the arguments of counsel, was pleased to order &c. He judged *de et super premissis;* and if the report of the surveyors brought the case within the true meaning of the words of the policy, he, by adopting their conclusion, may be fairly said to agree therewith.

The real question is, whether the surveyors have established in their report, that the vessel was *unsound or rotten,* when the voyage commenced? It is perfectly clear, that *general* unsoundness could not be caused in a voyage of six weeks; but it is equally clear, that there may be a *partial* unsoundness in particular timbers, which could not with propriety destroy the character of a vessel as seaworthy. The ship-carpenters testified on the trial, that scarcely a single vessel sails on the ocean, without having some unsoundness in part of her timbers; and hence it is evident, that in the view of persons conversant in the structure of marine vessels, they

cannot be denominated unsound, or unseaworthy, merely because individual constituent parts of their hulls are in a state of decay. It requires an assemblage of such defects, to ascribe justly to them the appellation of being unseaworthy. We must recur to the language of the report, to ascertain what the surveyors have found.

They were thrice on board the brig, to execute the trust reposed in them. In their first visit, they ascertained the extent of her leakage in a given period of time, while the cargo was on board, and the devastation and effects produced by the rage of the elements which she had encountered:—in their second visit they examined the damaged state of the cargo:—in their third and last visit, when her cargo was unladen, they examined the particular parts of her internal structure, as I have already enumerated. Here I may observe, that it was proved on the trial, that some error must have crept into the phraseology of the report, respecting the middle and lower futtocks *meeting*, which does not occur in shipbuilding. Examining the whole of this return with attention, can we with safety pronounce, that the conclusion of the surveyors, or the decree of the judge, was grounded on the single fact of the brig being unsound or rotten? Is it not more natural to suppose, that the effects of the storm, and the difficulty, if not the impracticability, of procuring materials for refitting her for sea, as well as the decay of her timbers, formed a capital consideration, in the result of their several decisions? My mind is strongly inclined to the latter opinion; and if I am correct herein, it brings the case before us, within the precise principle established by judge *Washington*, in *Watson* and *Hudson* v. *The Insurance Company of North America*, as to a mixed cause of condemnation, on a clause in a policy of similar import to the present; and also by the unanimous opinion of this court in *Garrigues* v. *Coxe*, upon a motion for a new trial in *March* term 1809. 1 *Binn.* 592.

Upon the whole matter, I am satisfied, that the present motion should be denied.

BRACKENRIDGE J. The question in this case depends upon the clause in the policy, " if the above vessel, after a regular " survey, should be condemned for being unsound or rotten."

If this were to be considered as merely evidence, which goes to the question of seaworthiness at the attaching of the policy, it must go to the jury, coupled with other testimony in the case to bear upon the question of seaworthiness. But it would seem to be the intention of the parties, that this of itself should be the evidence, and be conclusive on the fact of a want of seaworthiness. It is an agreement that this should be assumed as conclusive evidence of the fact. Not but that a want of seaworthiness might be proved independent of this; but that if such evidence should exist, it should supersede farther investigation, and be of itself conclusive. The difficulty of proving a want of seaworthiness, which is in its nature negative, seems to have given rise to the clause. It is for the benefit of the insurer, and amounts to an agreement that this shall conclude. Taking it in this view, it ought to appear clearly and unequivocally, that the condemnation was upon this ground. But would it not be carrying it too far, to say, that it must be expressed unequivocally in so many words, and in direct terms, that the condemnation was on this ground? It would be restricting it to the exactness of special pleading, to say, that though it substantially appears that this was the cause, yet that not having said so in express terms, it cannot bar. It would seem reasonable, however, that it should appear, it was not the *principal* cause, or *a* cause, but *the* cause of condemation; and I take it, that it will be sufficient if a sale is recommended for this cause, though it is not said, that the vessel is condemned for that cause only.

In the case of *Watson* and *Hudson* v. *The Insurance Company of North America*, the report of the surveyors was, that many of the timbers mentioned were found to be unsound and rotten, and that in the shattered and stranded situation of the vessel, and the want of proper mechanics *there*, for repairing her, the repairs *would cost more* than the vessel was worth; and they recommended that she should be sold, and an order of sale was given on this report. By judge *Washington* in this cause, there was not thought sufficient found to bar, on the construction of this clause. I should have thought so too; though strong evidence to the jury of a want of seaworthiness at the outfit, left the question still open to the insurer.

1810.

ARMROYD
*v.*
UNION
INS. CO.

In this case the report goes much further, and would seem to me to state the unsoundness and rottenness as *the sole ground of the condemnation.* On the 12th of *November* the surveyors had the brig pumped dry. In fifteen minutes she made six inches water. They found that the mainmast had been cut away five or six feet from the deck, that a timber head, and two quarter deck stancheons on the starboard side had been carried away, and they recommended that a part of the cargo should be discharged, in order to take a farther view of the vessel and cargo. As to matter of unsoundness or rottenness, there had been yet no examination, not having come to the hull of the vessel, which must be the subject of examination, with a view to this matter. On the 14th of *November*, a part of the cargo having been discharged, they repaired on board, and upon inspecting the cargo, they found many of the barrels and half barrels much damaged by the sea water, and directed the whole cargo to be landed, so that it might be carefully examined, to enable them to ascertain what further steps would be most eligible to be taken for the benefit of the parties interested. All this is but preparatory to the examination as to the soundness or unsoundness of the vessel; there is nothing that respects soundness or unsoundness in the parts examined.

On the 24th of *November*, they come to examine the vessel with a view to this, or at least the examination respects this. " Having ordered the ceiling to be taken off, about the lower " futtock head where the middle and lower futtocks met, " from the main chains aft, *we found the timbers quite decay-* " *ed; that the upper breasthook and wing transom was in the* " *same decayed state; that the trunnels were started in many* " *places, and generally very loose and rotten, and that the* " *ceiling throughout was decayed and loose. We therefore* " *were of opinion that the said brig Fair American was un-* " *worthy of repair, and unfit for sea;* and that it would be " most to the advantage of the parties concerned, that she " should be forthwith sold at public auction."

To say whether the word " *therefore*" shall refer to the defects ascertained on the examination of the 24th, or shall relate to the defects ascertained on the examinations of the 12th and 14th also, ought not to be made a question of grammatical reference merely; for in that case I do not see how it could be restrained to the examination of the 24th,

and not extend to all that preceded. But it must be restrained or extended by what follows. It seems to me to be restrained by the words " unworthy of repair." What was unworthy of repair? The hull of the vessel. She had not such a body as was worth repairing; and that, by reason of unsoundness and rottenness. Repairs must respect chiefly the damaged parts, or deficient parts, apparent on the examination of the 12th or 14th. The unworthiness and unfitness for sea, that which had been discovered on the examination of the 24th. The want of timber or mechanics to make the repairs of mast &c. is not stated, as in the case of *Watson* v. *The Insurance Company of North America*, as making any ground for which the sale is recommended; nor is the matter of *cost*, as in that case, hinted at; but that the body of the vessel did not deserve any repairs that might be made. Unless therefore, we were to go so far as to say, that the report, or condemnation, or both, must in terms quadrate with the clause in the policy, and that it must be stated expressly that she is unsound and rotten, and for that reason condemned, and that not the facts only on which the sale is thought advisable, must be stated, but the conclusion drawn, I must think that the report in this cause satisfies the clause in the policy. I cannot suppose it to have been in the intendment of the parties, to require on the one side, or to expect on the other, such conclusion in so many words to be drawn; but only that sufficient should be set forth to warrant a court and jury in drawing the conclusion from the facts, and the substance of the cause of sale or condemnation. I am of opinion therefore that a court on demurrer, or a jury under the direction of a court, would be bound to consider the evidence of this survey as a bar to the demand of the plaintiff; and that where, from a statement of facts in a report specially made, the court and jury cannot but infer that the vessel was *unsound* and *rotten*, and that for that reason she was not worth repairing as to other defects, her situation is brought within the clause. I think therefore, there ought to be a new trial.

TILGHMAN C. J. said he adhered to the opinion he expressed upon the trial, and therefore concurred with Judge *Yeates* that the motion ought to be denied.

Motion denied, and
Judgment for plaintiff.